Robert L. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 85-1158.

District of Columbia Court of Appeals.

Argued April 11, 1989.
Decided Oct. 31, 1989.

Thomas B. Mason, Public Defender Service, with whom James Klein, Public Defender Service, Washington, D.C., was on the brief, for appellant.

Ann K.H. Simon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Charles L. Hall, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before MACK * and FERREN, Associate Judges, and GALLAGHER, Senior Judge.

FERREN, Associate Judge:

Appellant pleaded guilty to two counts of manslaughter while armed, D.C.Code §§ 22-2405, -3202 (1981 & 1989 Supp.), and five counts of manslaughter, id. § 22-2405 (1981), all arising out of an incident in which he struck and killed seven pedestrians with his car. The trial court sentenced him to consecutive terms of five to fifteen years in prison on each count. Appellant argues on direct appeal that he committed only one offense for which he was punished seven times in violation of the double jeop-

---

* Judge MACK was an Associate Judge of the court at the time of argument. She became an Associate Judge, Retired, on Oct. 1, 1989.

ardy clause of the fifth amendment. We disagree and thus affirm his convictions.[1]

## I.

At the plea proceeding, the government proffered that its evidence at trial would have shown that appellant drove his car on the wrong side of the street for several blocks, travelling at speeds of between fifty and eighty miles per hour; that when appellant attempted to move to the right side of the road, he hit the median strip and crashed onto the sidewalk and into a crowd of pedestrians; that he struck and injured nine pedestrians, killing seven of them; and that appellant's blood alcohol level was .105 percent at the time of the accident. Appellant testified, conceding that he was driving while under the influence of alcohol and narcotics. He did not recall the accident or any of the related events except for those occurring sometime after the injured pedestrians' relatives pulled appellant from his burning car.

## II.

■ Appellant relies on the double jeopardy clause, which prohibits "multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). This restriction on multiple punishments for one offense, however, "serves principally as a restraint on courts and prosecutors" who otherwise might seek to punish too severely, *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977); it does not limit the legislature's ability to

define criminal offenses. Thus, whether particular conduct constitutes one or several offenses, if not clear from the statutory language, is ordinarily determined by reference to the legislative intent in framing the offense. *See Ladner v. United States*, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958); *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

Appellant argues—and we agree—that neither the statute nor its legislative history defines manslaughter in the District of Columbia; manslaughter is defined, rather, by reference to the common law. *See United States v. Bradford*, 344 A.2d 208, 213 (D.C.1975).[2] Appellant then argues that the common law defines manslaughter by reference to the reckless act committed, not by reference to the number of victims. Therefore, he says, the trial court violated his rights under the double jeopardy clause by punishing him seven times for one reckless act—one offense.

We agree with appellant's analytic framework. If, as he suggests, the common law defines manslaughter by reference to the criminal act causing the harm, rather than by reference to the number of victims of that act, then appellant's convictions may have to be vacated for insufficient proof of more than one offense. But, as appellant would concede, if manslaughter is defined by reference to the number of victims, then there is no double jeopardy problem with appellant's punishment for multiple offenses because seven persons died as a result of appellant's conduct.

---

1. In entering his guilty plea, appellant did not waive his argument, vigorously presented to the trial court, that multiple sentences for a single offense—as evidenced by the face of the indictments—violated the double jeopardy clause, and the government does not contend otherwise. *See Menna v. New York*, 423 U.S. 61, 62–63, 96 S.Ct. 241, 242, 46 L.Ed.2d 195 (1975) (per curiam); *United States v. Bough*, 787 F.2d 1131, 1132 (7th Cir.1986) (collateral attack); *cf. United States v. Broce*, 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989) (after pleading guilty to two conspiracy charges on explicit premise of two separate agreements, respondents may not collaterally attack plea on ground that evidence outside record showed the two were but a single conspiracy).

2. The government argues that D.C.Code § 22–2405 (1981) evidences a legislative intent to define the offense of manslaughter by reference to the death of each victim. Section 22–2405 provides as follows:

   Whoever commits manslaughter shall be punished by a fine not exceeding $1,000, or by imprisonment not exceeding 15 years, or by both such fine and imprisonment.

   We cannot accept the government's argument, however. This statute only establishes the penalty for convictions of "manslaughter," leaving us to rely on the common law to define the substantive offense. *See Bradford*, 344 A.2d at 213.

Our task, therefore, is to determine how the common law of the District of Columbia defines the offense of manslaughter. There are no dispositive cases in this jurisdiction that determine whether a single reckless act[3] resulting in more than one death is a single offense, or constitutes multiple offenses, of manslaughter.[4] Appellant argues that we must look to English common law of the eighteenth century, which, he says, is binding on this court because it has not been abrogated by statute or by subsequent caselaw. He then contends that, under English common law, a single act resulting in multiple deaths constituted only a single offense of manslaughter.

In addressing appellant's argument, we discuss, first, the English common law precedent on which he relies. We conclude that these early decisions do not establish appellant's position. Next, we look at the later common law, analyze what the proper unit of prosecution is for manslaughter cases in the District of Columbia, and conclude that each death results in a separate manslaughter offense.

## III.

### A.

By Act of Congress, D.C.Code § 49–301 (1981), we are bound by Maryland common law in effect as of 1801 (incorporating English common law and statutes in effect as of 1776) unless expressly repealed or modified by statute.[5] As a result, we have decided cases according to rules that are "well entrenched in [the] common law." *O'Connor v. United States*, 399 A.2d 21, 24 (D.C.1979) (applying doctrine of transferred intent derived from English common law adopted by Maryland in 1776); *see also Linkins v. Protestant Episcopal Cathedral Found. of the Dist. of Columbia*, 87 U.S.App.D.C. 351, 187 F.2d 357 (1950) (applying doctrine of dependent relative revocation of wills from English case decided in 1716).

The court noted, however, that "shots fired or blows struck at different individuals will give rise to separate offenses appropriate for consecutive sentences". *Id.*, 152 U.S.App.D.C. at 382 n. 18, 471 F.2d at 934 n. 18; *see also Borrero v. United States*, 332 A.2d 363, 367 (D.C.1975) (pointing gun at two victims during single robbery constituted two separate armed assaults). Thus, it appears that an assault threatening a group as a whole may be considered a single offense while assaults that threaten or harm individual victims in a group constitute separate offenses.

---

3. The government has not conceded that appellant's striking the pedestrians constituted a "single act"; the government argues on appeal that even if there were but a single act, appellant has committed seven offenses. We do not decide whether appellant's actions in striking the pedestrians constituted a single act or multiple acts. We decide the issue on the assumption that Williams' actions would constitute a single inculpatory act.

4. The question whether a single act affecting more than one victim results in multiple offenses has received attention in this jurisdiction in contexts other than manslaughter. In *Murray v. United States*, 358 A.2d 314 (D.C.1976), and *Razzaaq v. United States*, 514 A.2d 783 (D.C. 1986), we interpreted statutes defining the offenses of negligent homicide and kidnapping, respectively, to mean that the harm to each victim constituted a separate offense. In those cases, we relied in part on the legislative intent to protect individual victims and in part on the nature of the offenses. The law governing assault is more difficult to discern. In *United States v. Alexander*, the United States Court of Appeals for the District of Columbia Circuit wrote that where by "a single act or course of action a defendant has put in fear different members of a group towards which the action is collectively directed, he is guilty of but one offense." 152 U.S.App.D.C. 371, 382, 471 F.2d 923, 933, *cert. denied*, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972) (footnote omitted).

5. D.C.Code § 49–301 (1981) provides in relevant part:

The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity ... shall remain in force except insofar as the same are inconsistent with, or are replaced by, some provision of the 1901 Code.

Construing this statute, we have said that "all consistent common law in force in Maryland at the time of the cession of the District of Columbia remains in force as part of the law of the District unless repealed or modified by statute," *O'Connor v. United States*, 399 A.2d 21, 25 (D.C. 1979), and that "[i]n 1776, Maryland adopted the common law of England as it then existed," *id. See also United States v. Jackson*, 528 A.2d 1211, 1215 (D.C.1987); *United States v. Tucker*, 407 A.2d 1067, 1069 (D.C.1979).

We have held, however, that by incorporating the common law of Maryland, see *supra* note 5, Congress did not intend to freeze the common law as it existed in 1801. *United States v. Tucker,* 407 A.2d 1067, 1069 (D.C.1979); *see Linkins,* 87 U.S. App.D.C. at 355, 187 F.2d at 360–61. Rather, Congress meant to incorporate the "dynamic" common law, not merely "its then-current pronouncements on specific problems." *Linkins,* 87 U.S.App.D.C. at 355, 187 F.2d at 361. As a consequence, at times we have declined to retain a common law rule, having concluded that D.C.Code § 49–301 "is not a bar to the exercise of our inherent power to alter or amend the common law." *United States v. Jackson,* 528 A.2d 1211, 1216 (D.C.1987) (prospectively abolishing year and a day rule in murder prosecutions); *see also Tucker,* 407 A.2d at 1069–70 (declining to follow common law rule that one reaches a given age on day preceding anniversary of one's birth).

█ We agree with appellant, however, that if there is a clear English common law rule defining the offense of manslaughter as of 1776 that would benefit him, we must apply that rule; because of *ex post facto* law concerns, whatever inherent power we have to amend the common law cannot be used to deprive appellant retroactively of a more lenient rule that would otherwise be in force.[6] If there is no such clear common law as of 1776, however, then we are left to discern and apply the "dynamic" common law of the District of Columbia derived from all reasonable, available sources. *See Linkins,* 87 U.S.App.D.C. at 355, 187 F.2d at 361. We therefore turn to the historic common law.

### B.

█ In arguing that the law of England in 1776 reflected a clear rule that a single act injuring two or more persons is but one offense, appellant initially cites two cases: *King v. Clendon,* 92 Eng.Rep. 517 (1730),

and *Rex v. Benfield,* 97 Eng.Rep. 664 (1760). In *Clendon,* the court dismissed an indictment charging the defendant with assault and battery of two individuals in a single count. The court held that, because the offenses were several, the indictment should have charged them separately. *Clendon,* therefore, arguably stands for the proposition that acts directed against different individuals constitute different offenses.

Appellant argues, however, that *Clendon,* which obviously does not support his position, was overruled in *Benfield,* a case of criminal libel. Benfield and four others were charged with unlawfully intending to "disturb, molest and disquiet" Daniel Cooke and to "destroy his domestic peace and happiness in his family, and the comfort he had in his said two children, John and Jane Cooke," and to injure Daniel Cooke in "his trade and business of a grocer" by singing songs outside of Daniel Cooke's home that libelled John and Jane Cooke. 97 Eng.Rep. at 664–65. Benfield appealed, claiming that the indictment could not lie against him because it charged as one offense two different offenses, the libel against John and the libel against Jane. *Id.* at 665. The crown answered that Benfield's actions constituted a single offense:

> [T]he gist of the charge is singing these songs, in the manner and with the intent charged in the information; and singing them at the father's door with intent to discredit him and his children, and disturb his domestic peace and comfort.

*Id.* at 666. The court distinguished *Clendon* and ruled for the crown, stating, in effect, that the criminal libel involved punishment for an offense, not compensation for injured individuals: "Can not the King call a man to account for a breach of the peace; because he broke two heads instead of one?" *Id.*

Appellant argues that the court in *Benfield* actually overruled *Clendon,* creating a new rule that single acts with multiple

---

6. In *Jackson,* we abolished the year and a day rule prospectively; failure to permit that rule to bar Jackson's murder prosecution would have violated the *ex post facto* clause of the fifth amendment. Because we can discern no applicable common law definition of manslaughter, we do not confront a prospectivity issue in this case.

victims constitute but a single offense. *Benfield*, however, does not support appellant's position because the court appeared to be making a distinction between continuous and distinct offenses—a distinction commonly used today.[7] *Compare Ebeling v. Morgan*, 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915) (each tearing of mailbags is separate offense); *In re Henry*, 123 U.S. 372, 8 S.Ct. 142, 31 L.Ed. 174 (1887) (each letter placed with or taken from post office with purpose of devising scheme or artifice to defraud constitutes separate offense) *with In re Snow*, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 (1887) (continuing cohabitation with more than one woman, in violation of statute banning polygamy, is single continuous offense); *see generally Owens v. United States*, 497 A.2d 1086, 1096 (D.C. 1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986). In short, the court appears to have defined the offense of criminal libel as the singing of songs to defame and injure Daniel Cooke, a course of action constituting but a single offense. *Benfield*, therefore, cannot be said to have overruled *Clendon*.

Appellant, however, cites another old English case, decided in 1819, that discusses manslaughter, *Rex v. Jennings*, 168 Eng.Rep. 859 (C.C. 1819).[8] (We discuss *Jennings* assuming, without deciding, that it reflects the common law 43 years earlier.) *Jennings* supplied a woman with defective coal. It exploded, killing Mary Cormack and injuring Mary Anne Condon. *Jennings* was tried and convicted of manslaughter for the death of Mary Cormack and received the benefit of clergy.[9] Later, Mary Anne Condon died and *Jennings* was tried and convicted of manslaughter for her death. The trial court stayed the judgment because of a doubt whether, "as this prisoner had previously received the benefit of clergy for the same act, he could, on this trial, receive a punishment for the death which had taken place subsequently to his former trial." *Id.* The appeals court held that "the former allowance of clergy protected the prisoner against any punishment upon the second verdict." *Id.*

Appellant argues that *Jennings* reflects the rule that one act leading to multiple deaths constitutes a single offense. We cannot agree. *Jennings* dealt with an issue of pardon law—the benefit of clergy—not with the substantive definition of manslaughter. Significantly, the court in *Jennings* relied on *Cole's Case*, 75 Eng.Rep. 607 (1571), which detracts from appellant's

---

**7.** This distinction between a single offense for breach of the peace and multiple offenses for each wounding was recognized in *People v. Majors*, 65 Cal. 138, 141, 3 P. 597, 600 (1884), in harmonizing early common law cases in the United States.

**8.** The facts in *Jennings* are set forth more fully in *Regina v. Brettel*, 174 Eng.Rep. 656 (1842).

**9.** "Benefit of clergy" in eighteenth and nineteenth century England operated to mitigate the harsh effects of English criminal law, which punished most serious crimes with death. Before the fourteenth century, the clergy were subject to the jurisdiction of the ecclesiastical courts, not to the jurisdiction of the king's courts, for criminal offenses. *See* J.M. BEATTIE, CRIME AND THE COURTS IN ENGLAND 1660–1800, at 141 (1986). By the fourteenth century, a compromise developed whereby the clergy could be tried in the king's court but, if convicted, were given to ecclesiastical courts for punishment. *Id.* By the fifteenth century, the courts began to accept proof of literacy as the test for clerical status, with the result that benefit of clergy became a "massive fiction" that "tempered in practice the harshness of the common law rule

that virtually all felonies were capital offenses." *Id.* At the same time, however, benefit of clergy was limited to male first offenders, and such offenders were branded on the hand to evidence their status. *Id.* at 142–43. In the sixteenth century, perhaps because "the number of serious offenses appeared to increase," statutes began cutting back on the types of crimes for which benefit of clergy was available, excluding treason, murder, rape, and highway robbery. *Id.* at 143. Benefit of clergy became available to women in a limited way in the early seventeenth century. *Id.* at 142. By the beginning of the eighteenth century, benefit of clergy was available to all men and women, without regard to literacy, and the requirement that the offender be turned over to the ecclesiastical courts for punishment had been abolished. *Id.* at 142. As a consequence, "a clear distinction emerged for the first time between capital and non-capital offenses as the distinction between those who might or might not qualify for clergy disappeared." *Id.* at 143. Manslaughter remained a clergiable offense at the end of the eighteenth century. *See* M. HALE, 1 THE HISTORY OF THE PLEAS OF THE CROWN 466 (1778) (manslaughter not exempt from benefit of clergy as of date of publication).

argument. *Cole's Case* concerned whether a royal pardon for a misdemeanor—causing a wound—covered the subsequent death of the victim. The court agreed that any felony attributable to the death arose at the time of the death, not earlier at the time of the wounding, and that because the victim died after the pardon—which applied to "every thing that followed from" the wounding—the defendant could not be charged with the death:

> [T]he pardon discharged him, because the wound given by the prisoner was the cause of the felony, the giving of which wound was an offence and misdemeanor against the Queen, and that being pardoned by the Act, all the consequences that followed from the said offence are also pardoned thereby.

*Id.* Although *Cole's Case* concerned both earlier and later consequences of an act to the same victim, the court in *Jennings*, by citing *Cole's Case*, suggested it was equating the effect of the benefit of clergy with that of a royal pardon: both excuse all criminal acts occurring before the pardon or benefit of clergy, irrespective of later consequences.[10] *Jennings*, therefore, stands for the scope of the benefit of clergy, not for a substantive definition of manslaughter.[11]

10. This interpretation is consistent with Blackstone's analysis of the effect of the benefit of clergy: "[A]fter [benefit of clergy], [the felon] is discharged forever of that, and all other felonies before committed, within the benefit of clergy; but not of felonies from which such benefit is excluded...." 2 W. BLACKSTONE, COMMENTARIES, 374.

11. The court in *Jennings* also relied on *Hales v. Petit*, 75 Eng.Rep. 387 (1563), a complicated case concerning the forfeiture of land upon a suicide. A husband and wife jointly had leased real estate with a right of survivorship in the other. The husband committed suicide, and the King claimed the leasehold had been forfeited under the general rule that the land of felons is forfeited to the state. When the crown leased the land to another, the wife sued for trespass. The issue on appeal was whether the forfeiture occurred when the husband jumped into the lake or when he actually died a while later. The time at which a forfeiture was deemed to occur—at the time of the act or the time of death—would affect whether the wife was entitled to the land according to her right of survivorship or, instead, it had passed to the crown by

Our interpretation of *Jennings* is supported by two later English cases: *Regina v. Brettel*, 174 Eng.Rep. 656 (1842), and *Regina v. Dagnes*, 3 J.P. 293 (1839). In *Brettel*, the prisoner, who had been convicted of stealing a pig, was charged with stealing another pig at the same time he stole the first. The prisoner tried to argue that his case resembled *Jennings*. The judge disagreed, commenting: "It was impossible, there, [in *Jennings*] that the killing of one could be an offense identical with the killing of the other." *Id.* at 657. The judge implicitly was suggesting that in both *Jennings* and *Brettel* separate offenses were charged but that in *Brettel*, in contrast with *Jennings*, there was no intervening benefit of clergy. (The crown, however, at the judge's suggestion, chose not to put on evidence against Brettel, apparently because, as the judge stressed, he had already been punished for stealing the first pig. As a result, the prisoner was found not guilty.)

The other case, *Dagnes*, concerned a trial for the attempted murder of Dagnes's wife by putting poison in a tea kettle. Dagnes had been previously acquitted of the murder of his son, who had died from drinking the same poisoned tea. Dagnes argued that the issue of who had poisoned the tea had been resolved in the previous trial and,

forfeiture. The court denied relief to the wife, holding that the forfeiture had occurred at the time the husband committed the act of jumping into the lake. Drawing on the benefit of clergy as an analogy, the court wrote that just as a felon who takes his clergy "refuses the judgment of the law," so the husband by committing the suicidal act committed a felony by which he "exempted himself from and evaded the actual trial and sentence of the law." *Id.* at 402. Accordingly, the court argued, since those who take the benefit of clergy thereby forfeit their goods and chattels, "*a fortiore* he shall forfeit his goods and chattels here by this evasion and refusal of the law." *Id.* And just as the act of the taking of clergy is an "act[ ] of refusal of the law ... [s]o here, the throwing himself into the water was the act that made the felony ... and to that time, being in his life, the forfeiture shall have relation." *Id.* The *Jennings* court citations to *Hales v. Petit* supports our interpretation of *Jennings* as dealing with an issue of benefit of clergy law rather than with the substantive law of manslaughter.

therefore, that he was entitled to an acquittal for the attempted murder of his wife. The trial court ruled, however, that the trial could go forward because the issue was whether Dagnes attempted to poison his wife, "quite a different person, the subject of quite a different offence." 3 J.P. at 294. Appellant would have us disregard *Dagnes* on the ground that the proof of intent as to the two victims differed; Dagnes, he said, had been acquitted of the murder of his son because of a failure of proof of malice, in contrast with the proof of intent available for the second prosecution. While this does appear to be one of the reasons for the result in *Dagnes,* the court stressed, nonetheless, that the attempted murder of the wife constituted a different offense. By allowing the case to go forward, the court in *Dagnes* at least suggested that the English common law did not universally apply a rule that one act leading to two deaths is a single offense.

We are unpersuaded that the English common law before 1776 embraced the rule appellant advocates. The only two cases decided before 1776 (*Clendon* and *Benfield*) do not support this rule; the one manslaughter case decided after 1776 (*Jennings* ) is also inapplicable; and later cases (*Brettel* and *Dagnes* ) cause even further doubt about appellant's position. In addition, no case decided in Maryland between 1776 and 1801 or in this jurisdiction thereafter appears to address this issue. Accordingly, we must turn to modern-day common law analysis, freed of old English common law constraints.

## IV.

Because there is no binding case law in the District of Columbia, we look to cases from other jurisdictions. The rule adopted by a substantial majority of the states is that each death resulting from a single act by the defendant constitutes a separate offense of manslaughter.[12] *See State v. Dunlop,* 721 P.2d 604 (Alaska 1986); *Holder v. Fraser,* 215 Ark. 67, 219 S.W.2d 625 (1949); *State v. Miranda,* 3 Ariz.App. 550, 416 P.2d 444 (1966); *People v. DeCasaus,* 150 Cal.App.2d 274, 309 P.2d 835, *cert. denied,* 355 U.S. 890, 78 S.Ct. 262, 2 L.Ed.2d 189 (1957); *State v. Lowe,* 130 So.2d 288 (Fla.Dist.Ct.App.1961); *Brown v. State,* 129 Ga.App. 743, 201 S.E.2d 14 (1973); *People v. Allen,* 368 Ill. 368, 14 N.E.2d 397 (1938), *cert. denied,* 308 U.S. 511, 60 S.Ct. 132, 84 L.Ed. 436 (1939); *State v. McFadden,* 320 N.W.2d 608 (Iowa 1982); *Fleming v. Commonwealth,* 284 Ky. 209, 144 S.W.2d 220 (1940); *Burton v. State,* 226 Miss. 31, 79 So.2d 242 (1955); *State v. Whitley,* 382 S.W.2d 665 (Mo.1964); *Jeppesen v. State,* 154 Neb. 765, 49 N.W.2d 611 (1951); *State v. Martin,* 154 Ohio St. 539, 96 N.E.2d 776 (1951); *State v. Seidschlaw,* 304 N.W.2d 102 (S.D.1981); *State v. Irvin,* 603 S.W.2d 121 (Tenn.1980); *In re Rathmell,* 717 S.W.2d 33 (Tex.Crim.App. 1986) (en banc); *State v. Myers,* 298 S.E.2d 813 (W.Va.1982). Some of these courts looked at the statutory language and legislative intent in interpreting the definition of the offense of manslaughter, an approach not applicable in the present case because that offense in the District of Columbia is defined by the common law. Courts adopting the majority rule, how-

---

**12.** This also is the majority rule in the similar contexts of negligent homicide, *see McHugh v. State,* 160 Fla. 823, 36 So.2d 786 (1948) (en banc), *cert. denied,* 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081 (1949); *State v. Bailey,* 127 N.H. 811, 508 A.2d 1066 (1986); *State v. Tuohy,* 31 Wash.2d 549, 197 P.2d 1014 (1948); *State v. Rabe,* 96 Wis.2d 48, 291 N.W.2d 809 (1980), and of murder, *see Neal v. State,* 55 Cal.2d 11, 9 Cal.Rptr. 607, 357 P.2d 839 (1960) (en banc), *cert. denied,* 365 U.S. 823, 81 S.Ct. 708, 5 L.Ed.2d 700 (1961) (attempted murder); *Gibson v. State,* 512 P.2d 1399 (Okla.Crim.App.1973); *Lawrence v. Commonwealth,* 181 Va. 582, 26 S.E.2d 54 (1943); *State v. Robinson,* 12 Wash. 491, 41 P. 884 (1895). Some opinions state the rule more

broadly than in the particular context in which it arises. *See, e.g., McKinney v. State,* 511 So.2d 220, 225 (Ala.1987) (prospective application of rule that single criminal act causing injury to more than one person may constitute more than one offense).

Pennsylvania is perhaps the only state which currently follows the minority position that a single act resulting in multiple deaths constitutes one offense of manslaughter. *See Commonwealth v. McCord,* 116 Pa.Super. 480, 176 A. 834 (1935). In *McCord,* the court stressed that the deaths resulted from a single unlawful act of the defendant. 116 Pa.Super. at 488, 176 A. at 837.

ever, also express non-statutorily based rationales supporting their result.

First, courts find a meaningful distinction between the offense of manslaughter and the reckless act leading to the deaths. *See Allen*, 368 Ill. at 378, 14 N.E.2d at 403. They stress that enactment of the offense is intended to protect every life and to punish the killing of each person. *See Miranda*, 3 Ariz.App. at 558, 416 P.2d at 452. The gravamen of the offense, therefore, is the killing of another person, not the acts leading to the killing. *Dunlop*, 721 P.2d at 609; *Miranda*, 3 Ariz.App. at 558, 416 P.2d at 452; *Whitley*, 382 S.W.2d at 667; *Jeppesen*, 154 Neb. at 767, 49 N.W.2d at 613; *Martin*, 154 Ohio St. at 541, 96 N.E.2d at 778; *Rathmell*, 717 S.W.2d at 35. Thus, each manslaughter offense is identified by proof of the death of a particular victim. *See Burton*, 226 Miss. at 39, 79 So.2d at 246; *Martin*, 154 Ohio St. at 541, 96 N.E.2d at 778; *Seidschlaw*, 304 N.W.2d at 106.

Second, courts have rejected the argument that defining the offense by reference to each death leads to disproportionate punishment for reckless acts. They have reasoned that multiple deaths are a foreseeable result of a reckless act, and that the fact that only one person, rather than several, may have died should be regarded as a fortuity that prevents what otherwise would be an expected—and justified—greater punishment. *See Dunlop*, 721 P.2d at 610; *McFadden*, 320 N.W.2d at 618; *Irvin*, 603 S.W.2d at 124; *Myers*, 298 S.E.2d at 816. These courts reason very simply, but persuasively, that a defendant's culpability is greater if more persons die from the reckless act. *See Irvin*, 603 S.W.2d at 124; *Myers*, 298 S.W.2d at 816; *see also Holder*, 219 S.W.2d at 626 (noting that courts which find multiple offenses do so on basis of "the natural inclination to attach greater gravity to the killing of several persons than to the killing of one").

We agree with the reasoning of these cases. In line with the majority rule, we hold that the offense of manslaughter in the District of Columbia is determined by reference to the number of victims who die as a result of the defendant's actions, not by reference to the number of acts causing death. Even if we assume, therefore, that Williams's act of striking the seven pedestrians and killing them constituted only a single act, the trial court did not err in sentencing Williams on seven counts of manslaughter.

*Affirmed.*