**James SPEAKS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 05–CF–1220.

District of Columbia Court of Appeals.

Argued April 24, 2008.

Decided Oct. 30, 2008.

---

**29.** *See Turner v. United States,* 622 A.2d 667, 679 (D.C.1993); *Hammond, supra* note 25, 880 A.2d at 1087–88.

Alice Wang, Public Defender Service, with whom James Klein and Jacqueline Frankfurt, Public Defender Service, were on the brief, for appellant.

Ann K.H. Simon, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese, III, Assistant United States Attorney, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, REID, Associate Judge, and GREENE, Senior Judge of the Superior Court of the District of Columbia.*

GREENE, Senior Judge of the Superior Court of the District of Columbia:

On May 4, 2005, a grand jury indicted appellant on one count of armed carjacking (knife) (D.C.Code §§ 22–2803 and –4502), three counts of armed kidnapping (knife) (D.C.Code §§ 22–2001 and –4502), three counts of armed second degree cruelty to children (D.C.Code §§ 22–1101(b) and 22–4502) (subsequently amended to delete the "armed" element pursuant to D.C.Code §§ 22–4501(f)–(g)), one count of assault with a dangerous weapon (car) (D.C.Code § 22–402) (hereinafter, "ADW"), and one count of carrying a dangerous weapon (knife) (D.C.Code § 22–4504(a)) (hereinafter, "CDW").

A jury trial began before the Honorable Hiram E. Puig–Lugo on June 7, 2005, and concluded in part on June 20, 2005, when the jury returned verdicts of guilty on the three second-degree cruelty to children counts. The following day, the jury acquitted appellant of armed carjacking, armed kidnapping and CDW, and announced it was unable to reach verdicts on ADW and the lesser included offenses of unarmed carjacking and unarmed kidnapping. Judge Puig–Lugo declared a mistrial as to those offenses. On July 6, 2005, appellant entered an *Alford*[1] plea to the ADW count in exchange for the government's agreement to dismiss the remaining charges.

On September 9, 2005, Judge Puig–Lugo sentenced appellant to consecutive twenty-four-month terms of imprisonment on the three counts of second-degree cruelty to children and a concurrent term of five years on the ADW count, suspended execution of all four sentences, and imposed concurrent three-year probationary periods on each count.

On appeal, appellant asserts that the trial court erred in two respects regarding the imposition of his sentences. First, he argues that imposing consecutive sentences for the three cruelty to children counts violated the Double Jeopardy Clause because the three counts merged into a single offense, having arisen from a single act that caused a grave risk of bodily injury to three children. Second, he contends that the trial court abused its discretion by purporting to comply with the court's voluntary sentencing guidelines, yet erroneously interpreting the guidelines as not requiring concurrent sentences for the three cruelty to children counts.

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

For the reasons which follow we reject appellant's merger argument, and we further hold that (1) where a trial court's sentence is indisputably lawful as being in compliance with statutory limits, (2) the record clearly reflects that the trial court meaningfully exercised its discretion in imposing the sentence, and (3) no other grounds for illegality of the sentence are shown, this court will not review a sentence based solely upon a contention that it is not in compliance with the guidelines. Consequently, we reject appellant's attack on his sentences and affirm his convictions.

## I.

The evidence adduced at trial established, *inter alia,* that early in the evening on February 18, 2005, Lichelle Foster strapped her three young daughters—five-year-old Rayonna and two-year-old twins, Tanaya and Taniya—in their car seats and set out in her vehicle. While stopped at a red light on Eastern Avenue at the intersection with Division Avenue, appellant, a stranger to Ms. Foster, opened the front passenger door of her vehicle and got in. At first appellant said nothing and Ms. Foster attempted to push him out of the car. As she pushed, he then said in a low voice, "can you help me?" She replied, "no, can you get out of my car?," whereupon appellant reached towards his side and then lunged at her, swinging his hand in an "overhead motion," and prompting Ms. Foster to open her door and fall out of the car into the street.

Hearing her daughters scream and realizing that they were still in the vehicle, Ms. Foster grabbed hold of the driver's side door and held on, but as the light changed and the car accelerated through the intersection, she was dragged a short distance, then fell to the roadway. After she briefly observed her car careen to the left of the center line, then "jerk" back to the right to avoid oncoming traffic as it drove away, Ms. Foster ran for help, eventually accepting a ride from an unknown man who drove off with her in the direction Ms. Foster's car had gone. About a block-and-a-half later, traffic had come to a standstill, and Ms. Foster saw that her car had crashed into a parked car. She got out of the car she was in and ran towards her car, screaming for her children. Once at her car, she "grabbed all three" girls who were "just screaming" and "very terrified." After she identified appellant on the scene, she and the children were taken to a hospital where it was determined that she and Rayona had sustained minor physical injuries. Photographs received in evidence showed that the passenger side of Ms. Foster's vehicle was damaged by the collision and that her car's air bags had deployed. The parked car impacted by the collision had been "totaled."

## II.

D.C.Code § 22–1101(b) provides, *inter alia:*

> A person commits the crime of cruelty to children in the second degree if that person intentionally, knowingly, or recklessly:
>
> (1) Maltreats a child or *engages in conduct which causes a grave risk of bodily injury to a child;* ...

Emphasis added.

Cruelty to children—unlike assault—includes the infliction of mental or emotional pain or suffering upon a child, as well as physically assaultive conduct. *Alfaro v. United States,* 859 A.2d 149, 157 (D.C.2004). As we previously have noted on more than one occasion, our statutes prohibiting cruelty to children are not limited to bodily harm; they were enacted pursuant to the authority of the state, "acting as *parens patriae,* to protect 'the

physical, *mental or moral well-being* of the child.' " *Alfaro* at 158, 159, citing *Nesbitt v. United States,* 205 A.2d 595, 596 (D.C. 1964) (emphasis in *Alfaro* ).

Appellant initially asserts that the trial court's imposition of consecutive sentences on the three counts of Second–Degree Cruelty to Children of which he was convicted violated the Double Jeopardy Clause because the counts arose from a single act that "caused a grave risk of bodily injury" to Rayona, Tanaya, and Taniya Foster. He argues that the statute defines second-degree cruelty to children "by reference to the criminal act causing the harm, rather than by reference to the number of victims of the act," and that consequently, purportedly relying on *Williams v. United States,* 569 A.2d 97, 98 (D.C.1989), "the unit of prosecution is the conduct itself, not each child affected by the conduct."[2]

Because the "essence of the offense" of cruelty to children, appellant contends, is the "conduct itself, *not each child affected by the conduct* " (emphasis added), the conduct itself is the proper "unit of prosecution" under *Lennon v. United States,* 736 A.2d 208, 210 (D.C.1999) (citing *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955)), and consequently, appellant's "single act of operating Ms. Foster's car in a manner that caused a 'grave risk of bodily injury' to her three children constitutes but a single offense."

Appellant's argument largely relies on a line of case authority from this court and the federal courts standing for the principle that "a single act that puts multiple victims in fear of injury constitutes a single assault." *See, e.g., Joiner v. United States,* 585 A.2d 176, 178 (D.C.1991) (a single shot fired toward a group of seven victims, none of whom were injured, constituted a single assault with a dangerous weapon); *Smith v. United States,* 295 A.2d 60, 61 (D.C.1972) (a "single threat directed to more than one person constitutes but a single unit of prosecution"); *United States v. Alexander,* 152 U.S.App. D.C. 371, 471 F.2d 923 (1972) (the single act of pointing a gun at multiple persons constituted a single assault with a dangerous weapon). He also directs our attention to *Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958), in which the Supreme Court held that a single shot fired at two federal officers, causing injury to each, nevertheless constituted a single assault under U.S.C. § 18–254.

The government argues, citing *Ladner,* that (1) the issue before us is one of statutory, not Constitutional interpretation, (2) the unit of prosecution intended by the legislature in enacting the second-degree cruelty to children statute was the child victim, not the proscribed conduct, and (3) consequently, a separate offense was committed by the defendant as to each child who was put at "grave risk of bodily inju-

---

2. Appellant cites *Williams* in support of his claim that "because the statute defines the offense 'by reference to the criminal act causing the harm, rather than by reference to the number of victims of that act,' the unit of prosecution is the conduct itself, not each child affected by the conduct." However, appellant's conclusory assertion with respect to the statute at issue here finds no support in *Williams.* Rather, the court there postulated that *if,* as appellant in *Williams* argued, "the common law defines manslaughter by refer-

ence to the criminal act causing the harm, rather than by reference to the number of victims of that act, *then* appellant's convictions may have to be vacated for insufficient proof of more than one offense. *But, ... if manslaughter is defined by reference to the number of victims, then there is no double jeopardy problem with appellant's punishment for multiple offenses because seven persons died as a result of appellant's conduct." Id.* at 98. (Emphasis added.)

ry" by appellant's conduct. We believe that the government is correct.

First, as *Ladner* made clear, the issue before us is not one of Constitutional interpretation, but rather statutory application. *Ladner, supra* at 173, 79 S.Ct. 209. Moreover, appellant's reliance on *Ladner* is misplaced for reasons not unlike those we expressed in rejecting a similar analogy by the appellant in *Ruffin v. United States,* 642 A.2d 1288, 1297 (D.C.1994):

> In *Ladner,* appellant violated a federal statute prohibiting the assault of federal officers when he fired a single shotgun blast into a car in which two federal officers were seated. Both of the officers sustained injuries and consequently appellant was convicted on two counts of violating the federal statute. The Supreme Court overturned one of the convictions, holding that the single blast gave rise to only one assault. The Court relied on its interpretation of the purpose of the federal statute,[15] rather than a controlling legal principle limiting the number of charges that can arise where a single gunshot results in multiple injuries.

\* \* \* \*

[15] *It is important to note that because the intent of Congress in passing the statute was unclear, the Court applied the rule of lenity, construing the statute as one intended to promote the orderly functioning of the federal government rather than to protect each officer as an individual.*

\* \* \* \*

Our decisions in *Murray v. United States,* 358 A.2d 314 (D.C.1976), and *Williams v. United States,* 569 A.2d 97 (D.C.1989), are applicable to and persuasive in the decision of the instant case.

In these cases, a single act by a motorist resulted in multiple deaths, and so convictions for multiple counts of negligent homicide, *Murray,* and manslaughter, *Williams,* were sustained. The key factor in these cases was the court's conclusion that *the statute defining the crime charged was intended to protect individual victims, and that the imposition of multiple punishments for a single act was not disproportionate with the appellant's criminal responsibility. See Murray, supra,* 358 A.2d at 320 (distinguishing the statute at issue from that construed in *Ladner, supra* ); *Williams, supra,* 569 A.2d at 104. Where "multiple deaths are a foreseeable result of a reckless act, ... the fact that only one person, rather than several, may have died should be regarded as a fortuity that prevents what otherwise would be an expected—and justified—greater punishment." *Williams, supra,* 569 A.2d at 104.

Emphasis added.

Here, as in *Ruffin,* we conclude that that the statute defining the crime with which appellant was charged was intended to protect individual victims, and that consequently, the gravamen of the offense is the *proscribed effect on each victim,* not the acts or omissions leading to it. *Compare Williams v. United States, supra.*

Indeed, as the government persuasively argues, to have it otherwise would compromise the plain language of the statute which *does not prohibit any particular defined act or conduct;* it prohibits only "engag[ing] in conduct" which has a *proscribed effect on a child, i.e.,* that which creates a "grave risk of bodily injury." [3] This, we think, is a powerful indication of

---

**3.** At least two of the cases primarily relied upon by appellant as purportedly analogous to the instant case, where courts have found the unit of prosecution to be the conduct

prohibited rather than the victim affected by the conduct, have focused on precisely specified conduct—sometimes with a wholly undefined victim. *See Lennon v. United States,* 736

the legislative intent that the "unit of prosecution" under the second-degree cruelty to children statute is the *child victim* who is exposed to injury by the offender, not the *acts* which caused the injury.

Here, appellant was found guilty by a jury, under three separate counts of an indictment, of conduct that caused a grave risk of bodily injury not to one child, but to three different children—Tanaya and Taniya Foster, the twin two-year-old daughters of Michelle Foster, and the twins' five-year-old sister, Rayonna. The evidence, considered in the light most favorable to the government, permitted a reasonable juror to conclude beyond a reasonable doubt that one child, Rayonna, sustained a physical injury as a result of appellant's conduct, and her two-year-old sisters sustained emotional pain and suffering and a battery (*i.e.*, they were "terrified" and "screaming" when their mother retrieved them from her vehicle, and as a consequence of the collision of the vehicle with a parked car, the airbags in their vehicle deployed and the parked car impacted by their vehicle was "totaled"). This, we conclude, was sufficient to permit separate convictions of appellant, and the imposition of consecutive sentences by the trial court, for three counts of second-degree cruelty to children.

### III.

D.C.Code § 22–1101(c)(2) provides that "any person convicted of cruelty to

children in the second degree shall be fined not more than $ 10,000 or be imprisoned not more than 10 years, or both."

On September 9, 2005, appellant appeared before Judge Puig–Lugo for sentencing. After having advised counsel and appellant that he had reviewed the presentence report and all of the written materials submitted by the parties, and after hearing from counsel and appellant, Judge Puig–Lugo imposed a "split sentence," (1) directing that appellant serve twenty-four months on each second-degree cruelty to children count of which he had been convicted, (2) ordering that the sentences run consecutively to one another, (3) suspending execution of the sentences as to all but time served, and (4) placing appellant on probation for three years.

Notwithstanding that appellant's sentences for the three counts of second-degree cruelty to children for which he was convicted plainly were within the statutory maximum sentence set out in D.C.Code § 22–1101(c)(2), he nevertheless asserts that the trial court abused its discretion in imposing *consecutive* sentences on the three counts because the court erroneously interpreted the District of Columbia's "Voluntary Sentencing Guidelines" (hereinafter, "guidelines") as not requiring concurrent sentences.[4]

D.C.Code § 3–101 established the "District of Columbia Sentencing and Criminal

---

A.2d 208 (D.C.1999) (violation of the Bail Reform Act); *Smith v. United States*, 295 A.2d 60 (D.C.1972) (threats to do bodily harm).

4. At appellant's sentencing, Judge Puig–Lugo announced that he had read the written submissions of counsel, including their arguments, and invited them to provide any needed changes to the presentence report, as well as anything they would like to add to their written pleadings. After appellant's counsel indicated that there were certain errors regarding appellant's alleged criminal history,

he noted that "there appears to be a dispute with respect to whether the three second-degree cruelty to children charges must be run concurrently or can—whether the Court has discretion to run them consecutively.... [I]t's the defense position that the Court has to run those concurrently." Judge Puig–Lugo noted it was the government's position that the sentences should be run consecutively. The guidelines provisions in issue were nos. 6.2 and 6.3. They provide, respectively:

6.2 Concurrent Sentences. The following sentences must be imposed concurrent-

Code Revision Commission" (hereinafter, "Commission"), and directed the Commission, *inter alia*, to:

(1) Promulgate, implement, and revise a system of *voluntary* sentencing guidelines for use in the Superior Court of the District of Columbia designed to achieve the goals of certainty, consistency, and adequacy of punishment, with due regard for the:

(A) Seriousness of the offense;

(B) Dangerousness of the offender;

(C) Need to protect the safety of the community;

(D) Offender's potential for rehabilitation; and

(E) Use of alternatives to prison, where appropriate;

. . .

Emphasis added.

D.C.Code § 3–105, "*Voluntary* Sentencing Guidelines," provides that with respect to the guidelines promulgated by the Commission

(a) The *voluntary* sentencing guidelines promulgated by the Commission *shall not be binding on judges.*

(b) *Notwithstanding the guidelines, the judge in an individual case may impose any sentence that does not exceed the maximum term prescribed by law* and is not otherwise prohibited by the Constitution or laws of the United States or the District of Columbia.

(c) The sentencing guidelines *shall not create any legally enforceable rights in any party* nor shall they diminish any rights that currently exist.

Emphasis added.

In addition to D.C.Code § 3–105(c)'s mandate that the sentencing guidelines promulgated by the Commission "shall not create any legally enforceable rights in any party," appellant acknowledges that the guidelines themselves provide that sentences under them, "just like sentences before the guidelines, are *not* appealable except when they are unlawful." (Emphasis in original.)

Nevertheless, appellant asserts that "even though a *sentence* that does not comply with the guidelines remains lawful as long as it does not exceed the statutory maximum," this court "may nonetheless review a trial court's *sentencing process* for an abuse of discretion to determine whether the trial court relied on an erroneous interpretation of the guidelines in imposing a lawful sentence." (Emphasis in original.) In support of this argument, appellant directs our attention to cases which have held that the sentencing process is subject to review where the sentencing judge is shown to have relied on improper or inaccurate information, or to have "totally failed to exercise his discretion in imposing sentence." *See, e.g., Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974) (trial court abused its discretion in sentencing a youth offender without making an explicit, statutorily-required finding that the offender would not benefit from treatment

---

ly: For non-violent offenses: multiple offenses in a single event, . . .

6.3 Judicial Discretion. The court has discretion to sentence everything else either consecutively or concurrently.

Appellant's trial counsel argued before Judge Puig–Lugo that because appellant had been convicted of multiple non-violent crimes in a single event, guideline 6.2 required imposition of concurrent sentences. However, the government asserted that guideline 6.2 was not applicable because there had been multiple *victims* of appellant's crimes—a factor not included in the language of 6.2—and that consequently, under guideline 6.3, Judge Puig–Lugo was vested with discretion to impose either consecutive or concurrent sentences. Judge Puig–Lugo agreed with the government and imposed consecutive sentences.

under the Federal Youth Corrections Act); *Houston v. United States,* 592 A.2d 1066 (D.C.1991) (trial court erroneously declined to exercise its discretion, following a uniform policy instead); *Coleman v. United States,* 123 U.S.App. D.C. 103, 357 F.2d 563 (1965) (trial judge failed to follow legally required standards in imposition of a sentence of death); *United States v. Stoddard,* 180 U.S.App. D.C. 209, 213, 553 F.2d 1385, 1389 (1977) ("appellate review of the sentencing process is in order where, for example, it is contended that the sentencing judge relied on improper or inaccurate information, that the defendant was not represented by counsel at sentencing, that the prosecutor violated his agreement not to allocute at sentencing or that a stiffer sentence was imposed because a defendant asserted his innocence at trial. The Supreme Court has also made plain that we are authorized to reexamine the sentencing process where it is alleged that the judge totally failed to exercise his discretion in imposing sentence").

The government's argument to the contrary is straightforward. Put succinctly, the government asserts the D.C.Code § 3–105 means what it says—that the guidelines are voluntary, they are "not binding on [trial] judges," they create no "legally enforceable rights" for either appellant or the government, and consequently, a trial judge "in an individual case may impose any sentence that does not exceed the maximum term prescribed by law." Inasmuch as the sentences imposed on appellant by the trial court concededly con-

formed to the statute, they may not be assailed on the sole ground that they are not compliant with the guidelines.[5] We agree.

Unlike the cases cited by appellant where appellate courts have reviewed the sentencing process, Judge Puig–Lugo did not fail to follow a statutorily-prescribed procedure in imposing sentence on appellant, rely on improper or inaccurate information, sentence a defendant unrepresented by counsel, consider representations by the government that violated a plea agreement with appellant, or fail or decline to exercise his discretion. In short, he did *not* do something he was legally required not to do, or *fail* to do something he *was* legally required to do. Rather, Judge Puig–Lugo considered the guidelines in determining an appropriate sentence for appellant, and heard representations from defense and government counsel as to their differing views as to how application of the guidelines should affect appellant's sentence. See footnote 4, *supra.* Thereupon, he concluded that the government's argument that the guidelines permitted consecutive sentences was correct, and he imposed them. *However, even had he concluded that the guidelines directed the imposition of concurrent sentences, he nevertheless could have chosen to impose consecutive sentences because (1) they were in compliance with the relevant statute, and (2) the guidelines were not binding and created no enforceable rights for appellant.*

---

**5.** Members of the District of Columbia Sentencing Commission, not surprisingly, have repeatedly and emphatically expressed views consistent with the language of D.C.Code § 3–105 with respect to the voluntary nature of the guidelines, the non-appealability of decisions interpreting and applying them, and the fact that they create no enforceable legal rights. *See, e.g.,* District of Columbia Sentencing Commission, *2006 Annual Report* 16, 59–60; District of Columbia Sentencing Commission, *2006 Practice Manual,* § 1–1, p. 1–2, n. 2, § 1.2.1, p. 1–3, § 5.3, p. 5–5, § 7.3, p. 7–1; District of Columbia Sentencing Commission, *2003 Annual Report* 18, n. 4; District of Columbia Sentencing Commission, *2002 Annual Report* 25.

As this court very recently held in another case where a trial judge's sentence was challenged based upon an assertion that the judge misinterpreted the guidelines, it is not our business to interpret the guidelines where they create no legally enforceable rights:

> We decline to interpret Section 5.2.2(2) [of the guidelines] and therefore decline to consider whether transgender status signifies "reduced physical capacity," as the trial judge reasoned. By design, the Voluntary Sentencing Guidelines are entirely voluntary, and judges are free to apply or ignore them as they see fit without interference by this Court. *See* D.C. SENTENCING GUIDELINES MANUAL at § 5.3 ("The guidelines are voluntary.... [A]ny lawful sentence is not appealable whether or not it complies with the guidelines."); *see also* D.C.Code § 3–105(a)–(c) (2001) ("The voluntary sentencing guidelines ... shall not be binding on judges [and] shall not create any legally enforceable rights in any party");

*Cook v. United States*, 932 A.2d 506, 507 (D.C.2007) ("the Superior Court Voluntary Sentencing Guidelines ... being *voluntary* would not have compelled the trial court to impose a lesser sentence") (emphasis in original). The Maryland Court of Special Appeals' observation about that jurisdiction's voluntary sentencing guidelines is applicable to the District's Guidelines as well: "Whether ... a trial judge scrupulously follows, outrageously flouts or clumsily misapplies the sentencing guidelines is simply none of our appellate business, unless ... such flouting or misapplying should coincidentally trigger one or more of our more limited and traditional reasons for reviewing a sentence." *Teasley v. State*, 54 Md.App. 454, 458 A.2d 93, 94 (1983), *aff'd*, 298 Md. 364, 470 A.2d 337 (1984).

*White v. United States*, 958 A.2d 259, 266 (D.C.App. 2008).

Our conclusion that appellant's argument to the contrary is unavailing is consistent not only with *White, supra,* but with the decisions of other State courts with voluntary sentencing guidelines comparable to those in the District of Columbia. *See, e.g., Teasley v. State, supra,* 470 A.2d at 340 ("[a]ssuming ... that the trial judge was unaware of the concurrent sentence provisions of the Guidelines, ... nevertheless a mistaken application of, or failure to apply, the guideline provisions by the sentencing judge who purports to be governed by their substance, does not require vacation of the sentence.... Nothing in the law requires that Guidelines sentences or principles be applied; they complement rather than replace the exercise of discretion by the trial judge"); *Ward v. State*, 567 A.2d 1296 (Del.1989) (where trial court's sentence was within the maximum allowed by statute, appellant had no ground for appeal simply because the sentence exceeded the advisory guidelines recommended by the State's Sentencing Accountability Commission); *Mayes v. State*, 604 A.2d 839, 843, 845 (Del.1992) (while a sentencing court abuses its discretion if it sentences on the basis of inaccurate or unreliable information, the sentencing guidelines "are considered voluntary and non-binding," and "no party to a criminal case has any legal or constitutional right to appeal ... a statutorily authorized sentence which does not conform to the sentencing [guidelines]"); *People v. Mitchell*, 454 Mich. 145, 560 N.W.2d 600, 614–15 (1997) ("Simply stated, because this Court's guidelines do not have the force of law, a guidelines error does not violate the law. Thus, the claim of a miscalculated variable is not in itself a claim of legal error.").

## IV.

For the foregoing reasons, the judgment appealed from is hereby

*Affirmed.*