Winston G. MURRAY, Appellant,

v.

UNITED STATES and District of Columbia, Appellees.

No. 7999.

District of Columbia Court of Appeals.

Argued Oct. 16, 1975.

Decided May 24, 1976.

Arthur J. Levine, appointed by this court, for appellant.

Robert E. Hauberg, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and James A. Fitzgerald, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee United States.

C. Francis Murphy, Corp. Counsel, Washington, D. C., at the time, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton and James N. Dulcan, Asst. Corp. Counsels, Washington, D. C., entered appearances for appellee District of Columbia.

Before YEAGLEY, HARRIS and MACK, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted by a jury of two counts of negligent homicide, D.C.Code 1973, § 40–606, and of driving under the influence of intoxicating liquor, id. § 40–609(b). He also was found guilty by the court of failing to keep to the right. Highways and Traffic Regulations, Part 1, § 30. He was sentenced to one year of imprisonment for each count of negligent homicide, six months for driving under the influence of intoxicating liquor, and ten days for failing to keep to the right. All sentences were to run consecutively.[1] Appellant challenges: (1) the failure of the indictment to distinguish between voluntary and involuntary manslaughter; (2) the admission of blood alcohol content test results at trial; and (3) the imposition of consecutive sentences for the single act which resulted in the deaths of two different persons. We affirm.

I

On the night of June 7, 1973, appellant was driving along Delacarlia Parkway on the wrong side of the median strip. Witnesses in another car, traveling a short distance behind appellant in the same direction on the correct side of the median, attempted to warn appellant by honking the horn of their Fiat several times. Another car drove past appellant's vehicle, coming from the opposite direction on the same side of the median strip. Neither of these events caused appellant to apply his brakes or change directions. A few seconds later, appellant's car collided head-on with a Porsche. The Porsche had been driven by Henry Bodman, and was occupied also by Dorothy Bodman, his wife, and 17-year-old Diane Bodman. The occupants of the Fiat, who had been observing appellant, rushed over to the scene of the collision. The only sound or movement in the Porsche came from Diane Bodman.[2] Both Mr. and Mrs. Bodman apparently were dead. Appellant was under the steering wheel of his car, but was conscious and moving.

Metropolitan Police Officer James Walson arrived at the scene of the collision minutes later. He observed that appellant's "eyes were watering, his speech was stuttering, his movements were impaired." He also noticed that appellant's breath "had a very strong odor of alcohol." An almost-empty pint bottle of whiskey was on the floorboard by the appellant's feet.

Mr. and Mrs. Bodman were taken to the emergency room of Georgetown University Hospital, where they were pronounced dead on arrival. Appellant was rushed to the cardiac trauma room of the same hospital. A battery of emergency tests were performed on him immediately, which necessitated the drawing of several vials of his blood. Both the doctors and the nurse attending

---

1. After serving five months of imprisonment, appellant was released on his personal recognizance pending the outcome of this appeal.

2. The record contains no further reference to Diane Bodman, other than to the fact that the first police officer on the scene assisted her out of the Porsche.

appellant concluded, through observation, that he was intoxicated.

Metropolitan Police Detective Carr, who previously had been at the scene of the collision, came to the emergency room to continue his investigation. After attempting to communicate with appellant, and concluding that he was intoxicated, Carr requested the nurse to take a sample of blood from Murray. The nurse informed the detective that she already had done so, and gave him some of appellant's blood. This blood later was analyzed and was shown to contain .35 per cent alcohol.[3]

Defense counsel filed no pretrial motions. However, at the start of the proceedings, the trial judge entertained two oral motions made on behalf of appellant. The first challenged the indictment, which charged appellant with manslaughter, without specifying voluntary or involuntary manslaughter. The second was an objection to the anticipated introduction into evidence of the blood alcohol test results. Counsel argued that the taking of the blood sample fell within the provisions of the District of Columbia's Implied Consent Act, D.C.Code 1973, § 40–1005(b), giving the defendant the right to prevent the use of such evidence against him. Both motions were denied.[4]

## II

Appellant urges that his convictions for negligent homicide should be reversed and the indictment dismissed because the indictment charging him with manslaughter was fatally defective.[5] The defect alleged was duplicity in failing to distinguish between voluntary and involuntary manslaughter. Although voluntary and involuntary manslaughter are separate offenses which must be charged in separate counts if the government desires to charge both, *United States v. Bradford,* D.C.App., 344 A.2d 208 (1975), the original duplicitous nature of the indictment was corrected when the government elected to proceed solely upon a theory of involuntary manslaughter.[6] Such an election is an appropriate remedy for a duplicitous indictment. *United States v. Starks,* 515 F.2d 112, 116–18 (3d Cir. 1975); *Bins v. United States,* 331 F.2d 390, 393 (5th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964). *See United States v. Bradford, supra; United States v. Pender,* D.C.App., 309 A.2d 492 (1973).

After the government's election to proceed only on involuntary manslaughter, the trial suffered none of the infirmities

---

3. A blood alcohol level of .10 per cent is prima facie proof that a person is under the influence of intoxicating liquor. *See* D.C. Code 1973, § 40–609a(3). Appellant later was taken to D. C. General Hospital, where a second blood alcohol content test was performed. The results of that test, on blood extracted from appellant eight hours later, indicated a blood alcohol level of .22 per cent. The government did not attempt to introduce the results of the second blood test into evidence, both because it contended it was not necessary to do so and because inadequate precautions were taken at D. C. General to preserve the chain of custody.

4. The government notes that the motions were untimely in violation of Super.Ct.Cr.R. 47–I(c), and contends that this untimeliness was the basis for the trial court's denial of the motions. The record reveals, however, that the trial court ruled on the merits of the motions.

5. The two-count indictment read that the appellant "feloniously, wantonly, and with gross negligence" caused the death of each of the Bodmans by driving his automobile into theirs. The only difference between the counts was the name of the victim.

6. The trial court understood the indictment to charge only involuntary manslaughter because it tracked the language of the indictment challenged in *United States v. Pender,* D.C. App., 309 A.2d 492 (1973). In that case, this court construed the indictment to charge involuntary manslaughter only. Since we conclude that the government's election cured the defect in this indictment, we need not decide whether henceforth, in light of the decision in *United States v. Bradford, supra,* the terms "voluntary" or "involuntary" must be used to differentiate sufficiently between the two offenses.

associated with one based upon a duplicitous indictment. The government adduced no proof inconsistent with a charge of involuntary manslaughter; motions for judgments of acquittal were addressed solely to that charge (and to the charge of negligent homicide, a lesser-included offense); and the jury was instructed only on involuntary manslaughter.[7] Finally the jury acquitted appellant on the charge of manslaughter as to both victims, which abrogated any question as to which crime the indictment referred.

### III

▪ Appellant's next contention involves the construction of the District of Columbia's Implied Consent Act.[8] The section of that Act upon which appellant relies provides that when a person is unconscious or otherwise incapable of refusing to submit to a blood test, such person nevertheless is presumed to have consented to the tests.[9] It further provides that evidence thus obtained from an incapacitated person shall not be used against him if he later objects to its introduction.[10] The sanction imposed upon one who so objects is the automatic loss of his operator's permit for a period of six months. Although the Act's provisions in general are triggered by circumstances such as those present in this case, appellant may not take advantage of that section.[11] Construing § 40–1005(b) in light of the statute's overall purposes, we find that its evidentiary exclusion provision does not apply in cases involving death or personal injury.

The Implied Consent Act provides for chemical testing to determine the blood alcohol content of two categories of motor vehicle operators. The first includes all those operating a motor vehicle in the District of Columbia who are arrested and believed to be under the influence of alcohol. Those persons are deemed to have given their consent to submit to chemical testing.[12] Refusal to give a specimen, which is a permissible alternative for this category of operators, subjects the motorist to revocation of his license for a six-month period.[13]

The second category (actually a sub-category of the first) includes those motorists who are involved in accidents resulting in death or personal injury. Unlike other drivers, persons involved in serious motor vehicle accidents who are arrested and be-

---

7. The jury was instructed twice on the charge of manslaughter. The trial judge cautioned that only involuntary manslaughter was at issue: "There are two kinds [of manslaughter]. Voluntary which is not this case—it is not the charge in this case. The charge is involuntary manslaughter."

8. D.C.Code 1973, § 40–1001 et seq.

9. Id. § 40–1005(b).

10. The attending surgeon at the emergency room testified that although appellant was not unconscious, he was in a "stuporous" mental state, "sometimes a bit restless but generally looking as though he is asleep or comatose."

11. The government argues that the Implied Consent Act is inapplicable to appellant's situation because his blood was extracted in accordance with hospital emergency procedures, rather than at the direction of a police officer, thus making the extraction the equiv-

alent of a private search the fruits of which later were turned over to the government. To adopt such an interpretation would be to ignore reality and hinge the operation of the Act on a fortuity. Two police officers detected the odor of liquor on appellant's breath before a request was made that a sample of his blood be drawn. The hospital delivered the specimen to the police only after Detective Carr's investigation prompted him to make such a specific request. It would be unreasonable to require the attending nurse or physician to draw additional blood simply to comply literally with the statute when an adequate amount was already available. The particular sequence of events which occurred here does not render the Act inapplicable where it is obvious that the blood test procedure has law enforcement motivations and consequences.

12. D.C.Code 1973, § 40–1002(a).

13. Id. § 40–1005(a).

lieved to be under the influence of alcohol are not given the option to refuse to submit to testing.[14] This limitation is made clear by both the language of the act and its legislative history.

Section 40-1002(b) is that part of the Implied Consent Act which mandates the testing of an operator who is involved in a motor vehicle collision in which death or bodily injury results. Explaining the statute to the District of Columbia Committee of the United States Senate, a spokesman for the District of Columbia stated that "such a provision is of the utmost importance in the charging, prosecution, and determination of appropriate penalties of persons involved in such accidents." [15] Further testimony at the hearings revealed the rationale for this strict, inflexible provision:

> The reasoning behind [mandatory testing in personal injury and fatality cases] was, where there are serious cases, where possible negligence and homicidal manslaughter or second degree murder charges even might arise, the drivers involved will choose to refuse to take the test and avoid scientific evidence that may be needed in order to bring about a conviction for the more serious crimes . . . . [16]

The Senate, in its final report accompanying the Implied Consent Act,[17] adopted the Commissioner of the District of Columbia's view that a motorist would not be allowed to refuse to give a specimen for

testing in those cases involving death or personal injury.[18]

■■■ Since the specific provision upon which appellant relies does not unambiguously differentiate between the two categories of motorists discussed above, its import must be judged according to the goals which Congress intended the overall Act to effectuate. *National Petroleum Refiners Association v. F. T. C.,* 157 U.S.App. D.C. 83, 100, 482 F.2d 672, 689 (1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L. Ed.2d 567 (1974). In our view it would do violence to the intent of this statute to read § 40-1005(b) in isolation and construe it in a way which would thwart successful prosecution of motorists causing serious injury or death while under the influence of alcohol. The statute's draftsmen readily recognized that a motorist faced with the alternatives of the introduction of damaging evidence in a criminal proceeding on one hand, and the automatic revocation of his driver's license for six months on the other hand, invariably would choose the latter. To interpret the Act to provide that unconscious motorists involved in serious accidents later could object successfully to the introduction of scientific evidence against them, while conscious motorists would be denied that right in similar circumstances, would lead to an absurd result. Accordingly, we reject appellant's interpretation of the Act and hold that under its provisions, a driver in appellant's situation may not refuse to submit to chemical testing and may not object to the introduction of the test results against him on the

---

14. *Id.* § 40-1002(b).

15. Hearings on S. 2715 Before the Subcomm. on Business, Commerce and Judiciary of the Senate Comm. on the District of Columbia, 92d Cong., 2d Sess. 23-24 (1972).

16. *Id.* at 29.

17. S.Rep. No. 1262, 92d Cong., 2d Sess. 4 (1972).

18. Both at trial and on this appeal, appellant has attached considerable significance to one

sentence appearing in the Senate Report: "A motorist would be allowed to refuse to give a specimen for testing in those cases involving death or personal injury." *Ibid.* The trial court, considering that sentence in light of the generally expressed legislative objective of mandatory testing in such cases, concluded that the troublesome statement must be attributable to a typographical or printing error. We have concluded that the Senate Report does contain an error and that the original sentence read in the negative. See Hearings on S. 2715, *supra* note 15, at 43.

ground that he was incapable of refusal when the specimen was extracted.[19]

## IV

■ Finally, appellant contends that the trial judge could not properly impose consecutive sentences on the two counts of negligent homicide since a single collision caused the death of both victims. The question of the extent of the punishment which properly may be imposed upon the perpetrator of a single act which results in the death of multiple victims has not previously been presented to this court in this posture. We conclude that a trial judge has the power to impose consecutive sentences for the negligent homicide of two persons in a single automobile accident.

Our inquiry is guided by the principles of *Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958), in which the Supreme Court disallowed consecutive sentences for one assault on two federal officers. The Court indicated that where the underlying criminal statute is ambiguous and does not clearly fix the punishment for an offense, the doctrine of lenity may require the trial courts to apply the less harsh alternative. 358 U.S. at 177–78, 79 S.Ct. 209. Appellant urges applica-

tion of the doctrine in the instant case by arguing that our negligent homicide statute reflects the requisite degree of ambiguity. We disagree.

The ambiguity which the Court found in *Ladner* was in the design of the statute. It concluded that it was at least as plausible that the statute's primary purpose was to foster the smooth functioning of the federal government as it was to protect federal officers from harm.[20] The Court intimated, however, that had it agreed with the government's position that the statute basically was designed to protect federal officers from personal harm and that an assault upon each officer, therefore, constituted "a unit of prosecution", it would have sustained the consecutive punishments.[21]

■ We believe the negligent homicide statute unambiguously was designed to protect individual victims. In *Ladner,* the thrust of the statute under consideration warranted the conclusion that because it was possible to impede federal officers in the performance of their duties without harming them, the Court could consider "the act of hindrance as the unit of prosecution without regard to the number of federal officers affected by the act."[22]

> [E]vidently the Court was uncertain whether the principal design of the Mann Act was to protect each woman carried across state lines, or rather to strike generally at the business of white slave trading and in particular at its use of interstate transportation facilities. [*Barringer v. United States,* 130 U.S.App.D.C. 186, 187, 399 F.2d 557, 558 (1968), *cert. denied,* 393 U.S. 1057, 89 S.Ct. 697, 21 L.Ed.2d 698 (1969).]

19. Appellant makes the additional contention that the Act requires the government to introduce the results of two chemical tests at trial in order to minimize error. While it is true that the Act authorizes the performance of two types of chemical tests, it does not mandate the proof of both tests at trial. We note that the government supplied defense counsel with the results of the second blood test which had been taken at D. C. General Hospital. *See* note 3, *supra.*

20. *Ladner v. United States, supra,* at 175–76, 79 S.Ct. 209. Another case upon which appellant has relied is *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), in which the Court found that the act of transporting two women simultaneously across state lines for immoral purposes constituted only one violation of the Mann Act and, hence, consecutive sentences were impermissible. Commenting on the *Bell* case, the United States Court of Appeals for this Circuit stated:

21. *Ladner v. United States, supra,* 358 U.S. at 173–77, 79 S.Ct. 209; *see United States v. Alexander,* 152 U.S.App.D.C. 371, 379–81, 471 F.2d 923, 931–33, *cert. denied,* 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972); *Barringer v. United States, supra* note 20, at 558.

22. *Ladner v. United States, supra,* 358 U.S. at 176, 79 S.Ct. 209, 213.

The negligent homicide statute is not analogous. The safety of individual citizens is not incidental to the purpose of the statute; it is the sole purpose of the statute. The gravamen of the crime is not the act of operating a motor vehicle negligently; rather, it is the killing of a human being. On the authority of *Ladner,* therefore, we hold that the rule of lenity does not apply to situations involving multiple victims where, as here, both the language and logic of the statute reflect the legislature's intent to safeguard the lives of its constituents as individuals.[23]

 The second theme sounded in *Ladner,* as a constraint upon the imposition of multiple punishments, is the requirement that the penalties imposed reasonably reflect the extent of the defendant's criminal responsibility. The Supreme Court voiced its concern as follows (358 U.S. at 177, 79 S.Ct. at 213):

> Punishments totally disproportionate to the act of assault could be imposed because it will often be the case that the number of officers affected will have little bearing upon the seriousness of the criminal act. For an assault is ordinarily held to be committed merely by putting another in apprehension of harm whether or not the actor actually intends to inflict or is capable of inflicting that harm. [Footnote omitted.]

We do not think that it exaggerates the seriousness of appellant's conduct to sanction the levying of multiple punishments in this case. We are impressed by the relevant reasoning of the California Supreme Court. Writing for that court, former Chief Justice Traynor stated:

> A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. [*Neal v. State,* 55 Cal.2d 11, 20, 9 Cal. Rptr. 607, 612, 357 P.2d 839, 844 (1960), *cert. denied,* 365 U.S. 823, 81 S.Ct. 708, 5 L.Ed.2d 700 (1961).][24]

Chief Justice Traynor elaborated on this concept in a dissent in a later case:

> [T]he act of killing A is essentially distinct from the act of killing B even when a single muscular contraction of the defendant is the common cause of both deaths. [*In re Hayes,* 70 Cal.2d 604, 75 Cal.Rptr. 790, 451 P.2d 430, 438 (1969).]

That appellant's conduct would have resulted in the tragedy which occurred was not fortuitous but, unhappily, was almost inevitable. The combination of an undue ingestion of alcohol and the resultant mishandling of automobiles causes awesome carnage on our highways daily. In fair-

---

**23.** Appellant's reliance on *Smith v. United States,* D.C.App., 295 A.2d 60 (1972), is misplaced. In *Smith,* we held that "phrased as the threats statute is, it seems clear that a single threat directed to more than one person constitutes but a single unit of prosecution." *Id.* at 61 (footnote omitted). The threats statute, D.C.Code 1973, § 22–507, merely proscribes "threats to do bodily harm". Thus, by its language, it announces the act of threatening to be the intended unit of prosecution. In contrast, the negligent homicide statute, D.C.Code 1973, § 40–606, proscribes "caus[ing] the death of another" by negligent operation of a motor vehicle, thereby focusing on the consequences of the act, rather than on the act itself.

**24.** This basic position has been adopted in several other jurisdictions. *See, e. g., State v. Prudhomme,* 228 N.W.2d 243 (Minn. 1975); *Brown v. State,* 129 Ga.App. 743, 201 S.E.2d 14 (1973); *State v. Miranda,* 3 Ariz.App. 550, 416 P.2d 444 (1966); *State v. Whitley,* 382 S.W.2d 665 (Mo.1964); *People v. DeCasaus,* 150 Cal.App.2d 274, 309 P.2d 835, *cert. denied,* 355 U.S. 890, 78 S.Ct. 262, 2 L.Ed.2d 189 (1957). *Contra, People v. Holtz,* 19 Ill.App.3d 781, 313 N.E.2d 234 (1974).

ness it can be said that appellant could hardly have chosen a means which would have been more likely to result in injury to many persons. We conclude that the imposition of consecutive one-year terms of imprisonment on the two negligent homicide convictions was within the discretionary power of the trial judge.

*Affirmed.*